UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X--------------------------------------------------------------X

HASSAN EL-NAHAL, individually and on behalf of
all others similarly situated,

                                          Plaintiffs,

                        -against-

DAVID YASSKY, MATTHEW DAUS, MICHAEL
BLOOMBERG, and THE CITY OF NEW YORK,

                                    Defendants.
X--------------------------------------------------------------X

              __ -cv- __

        **CLASS ACTION**
         **COMPLAINT**

## NATURE OF THE ACTION

1.     This action is to vindicate the rights of New York City taxi drivers to be free from unconstitutional, warrantless invasions of their privacy using Global Positioning System (GPS) tracking devices, to restore taxi driver licenses that have been revoked, to recover lost income, and to provide for the re-payment of fines secured fraudulently by the New York City Taxi and Limousine Commission.

2.     GPS is a satellite-based technology capable of tracking an individual's precise location and movement twenty-four hours a day, and of creating a detailed record of a person's daily activities, habits, and interests.  In *United States v. Jones*, 132 S.Ct. 945 (2012), a decision issued on January 23, 2012, the United States Supreme Court held the that the state's installation of a GPS device in a vehicle and its use of that device to monitor the vehicle's movements constitutes a "search" under the Fourth Amendment to the Federal Constitution.  In 2009, the New York Court of Appeals had reached the same conclusion in *People v. Weaver*, 12 N.Y.2d 433, 882 N.Y.S.2d 357 (2009).

3.     Because GPS tracking is a search under the federal and state constitutions,

use of GPS technology to track individuals must be authorized by a warrant based on probable cause or by a recognized exception to the warrant requirement.  Nevertheless, the New York City Taxi and Limousine Commission (TLC) has prosecuted hundreds of individuals for overcharging passengers.

4.     In many cases, including that of Hassan El-Nahal, the TLC ultimately revoked hack licenses solely on the basis of GPS tracking evidence, without even a single complaining witness complaining or testifying against them.  While in Mr. Hassan's case, the license was ultimately restored by order of the TLC Appeals Tribunal, other taxi drivers' licenses have been revoked permanently.  Still others were able to avoid revocation only by payment of hundreds or thousands of dollars in fines to the TLC.

5.     Plaintiff, suing on his own behalf and on the behalf of other taxi drivers similarly situated, submits that the evidence allowed against plaintiff and his fellow taxi drivers, who are businessmen engaged in a private trade, was gathered in violation of the Constitution, leading to prosecution, the loss of their livelihoods, and substantial fines.

6.     Plaintiff further submits that the TLC fraudulently induced taxi drivers to settle actions brought by the TLC either by paying large fines or by agreeing to surrender their licenses.   The TLC induced these settlements by making false claims regarding the quality and nature of the evidence it had against the taxi drivers.

## PARTIES

7.     Plaintiff Hassan El-Nahal is a NYC taxi driver and a resident of Queens County.  He has been a licensed taxi driver with an excellent driving record for nearly 20 years.

8.     Defendant the City of New York is a municipality of the State of New York.  The TLC is an agency of the City of New York.

9.     Defendant David Yassky is Chairman of the TLC and one of its nine commissioners.  The allegations against him are in his official and personal capacities.

10. Defendant Matthew Daus is the former Chairman of the TLC. The allegations against him are in his official and personal capacities.

11. Defendant Michael Bloomberg is the Mayor of the City of New York. The allegations against him are in his official and personal capacities.

## JURISDICTION AND VENUE

12. This action arises under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367 and 2201.

14. The acts complained of occurred in part in the ___ District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

15. Plaintiff demands a jury trial.

## FACTUAL BACKGROUND

16. Unlike other workers who may be protected by civil service standards or by contract, taxi drivers are independent businessmen.

17. Taxi driver's licenses are protected only by public law and by the state and federal constitutions. The political voice of taxi drivers is likewise muted as 91% are first generation immigrants, with the largest group, 43% of the total, from South Asia, principally India, Pakistan, and Bangladesh.

### The TLC Imposes Mandatory GPS Tracking Technology

18. Starting in 2007, the TLC mandated that all NYC medallion taxis must be equipped with its so-called Taxi Technology System or TTS. The TTS system includes a GPS tracking device that uses a Global Positioning System or GPS. According to Garmin Ltd., a leading manufacturer of GPS devices, GPS "is a satellite-based navigation

system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense. GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use. GPS works in any weather conditions, anywhere in the world, 24 hours a day." Garmin website at http://www8.garmin.com/aboutGPS/.  The New York Court of Appeals characterized GPS as a "sophisticated and powerful technology that is easily and cheaply deployed and has virtually unlimited and remarkably precise tracking capability." *People v. Weaver*, 12 N.Y.3d at 441, 882 N.Y.S.2d at 361.

19.    There is no statute authorizing or suggesting that the TLC mandate installation of GPS tracking devices in taxicabs.  However, the TLC has acted by rule on its own.  By its rules, the TLC requires that every taxicab contain such a tracking device as part of a so-called "Taxi Technology System."  Specifically, TLC Rule 1-11G, provides:

> The owner of any taxicab required to be equipped with a taxicab technology system shall contract to procure such equipment on or before August 1, 2007. Except as provided in this subdivision, the owner shall install a taxicab technology system no later than the compliance date set forth in section 1-01 of this chapter.[1]

20.    The technology must include "hardware and software that provides … (iii) trip data collection and transmission required by section 3-06 of this title, and (iv) data transmission with the passenger information monitor required by section 3-07 of this title."

21.    TLC Rule 3-06 requires that each taxicab be capable of transmitting to the commission "at pre-determined intervals established by the Chairperson":

> [T]he taxicab license number; the taxicab driver's license number; the location of trip initiation; the time of trip initiation; the number of passengers; the location of trip termination; the time of trip

---

[1] Effective April 1, 2011, the TLC revised and renumbered the TLC Rules. *See* 35 R.C.N.Y. 70–01 ("Transition Rules"). In this Complain, we cite to the earlier versions of the rules in effect when the prosecutions were first announced.

termination; the metered fare for the trip; and the distance of the trip.

22.     Thus the TLC requires that all taxis and taxi drivers continuously transmit to the TLC or its agents by use of GPS their locations at all times.

23.     The installation and use of this technology is mandatory regardless of the consent of the taxicab owner or the taxi driver.

24.     While taxis must have this technology installed, nothing in the TLC's rules permits (or even mentions) the TLC to GPS tracking information to prosecute taxi drivers either criminally or administratively.

25.     There is no state statute or city ordinance that allows the TLC to use GPS tracking data for purposes of prosecuting an individual taxi driver such as Mr. El-Nahal.

### The TLC Assures the Federal Court, the Public, and Taxi Drivers that the Technology Will Not be Used for Individual Tracking

26.     In 2007, before these rules took effect, a group of drivers and the New York Taxi Workers Alliance filed a federal lawsuit in which they made a facial challenge to the rules and sought an injunction against their taking effect.  (*Alexandre et al v. New York City Taxi and Limousine Comm'n et al,* 07 Civ. 8175 (SDNY)).

27.     The *Alexandre* plaintiffs advanced federal privacy claims.  The federal court rejected those claims, finding that GPS tracking was not (at least not in 2007 before *Weaver* and *Jones* were decided) deemed a search for purposed of the Fourth Amendment.  *Alexandre,* 2007 WL 2826952 (S.D.N.Y. 2007).  Thus, despite the protests by drivers, the technology rules took effect.[2]

28.     In briefs submitted during the *Alexandre* litigation, the TLC and the City of New York assuaged the court's concerns with its assurance that the GPS and related technology would be used only for limited purposes, such as general regulation and

---

[2] A similar challenge was rejected by another federal district court judge in *Buliga v. New York City Taxi & Limousine, Comm'n,* 2009 U.S. Dist. LEXIS 94024 (S.D.N.Y. 2007).

information gathering.  The purported benefits of the technology—according to the TLC's court papers— were said to include: (1) the collection of "an enormous body of information to the TLC's regulatory analysis;" (2) enabling the TLC "to conduct automated comprehensive analyses of pick up points, drop-off points, trip time and distance and passenger counts;" (3) the assisting "in locating passengers' lost property;" and (4) allowing the drivers to "eliminate the obligation" of completing handwritten trip sheets.

29.     Nowhere in its briefs or affidavits did the TLC ever mention or suggest it would or might use the GPS data to track or investigate particular drivers or gain evidence for prosecutions.

30.     Judge Berman, in deciding *Alexandre* and rejecting the challenge, emphasized that the technology would eliminate the need for drivers to fill out trip sheets by hand and the convenience to passengers who could use credit cards.

31.     The TLC issued a "Statement of Basis and Purpose" in support of its rulemaking, which stated the reasons for its technology and GPS mandate.  In this statement, the TLC noted that the technology could "assist in the recovery of lost property;" that it would allow for "centralized data" to permit the "complex analysis of taxicab activity in the five boroughs for policy purposes; that it would "enable passengers to follow their route on a map;" and that it would "provide a valuable resource for statistical purposes."   There was no mention of using GPS data to investigate or prosecute taxi drivers.

32.     The TLC never stated its desire to track drivers for investigatory purposes of any kind.  Indeed it disavowed that intention in statements on its website in the form of a list of Frequently Asked Questions (FAQ).  The following questions and answers appear under "Driver Frequently Asked Questions":

**Is the TLC going to use this technology to track drivers?**
No, the TLC will only use this technology to provide those

customer service improvements described here.  Even more importantly for drivers, the TLC is replacing the current hand-written trip sheets with automatic electronic trip sheets which are limited to collecting pick-up, drop-off, and fare information, all of which are already required. This technology will also provide TLC with credit card tip information.

**Will my trip/fare information be transmitted to the Internal Revenue Service (IRS)?**
No, your fare information will not be automatically sent to the IRS.  There will be no changes to the current system, in which the IRS must send a subpoena to the TLC requesting trip sheet information.

**Will the systems be used to issue speeding tickets or other similar infractions?**
No, there are no plans to issue tickets for speeding or other similar infractions using the systems.

33.     Thus, in a series of statements to the federal court, to the public, and to taxi drivers, the TLC averred that its technology mandate was not designed for or geared towards the use of GPS to track, follow, or prosecute taxi drivers.

34.     Since then, as detailed below, the TLC has used the devices for just that purpose, resulting in the revocation of license based on TLC tracking, and despite the complete lack of evidence from anything other than GPS tracking and the related mandatory taxi technology.

**The Cheema Investigation and Prosecution**

35.     Sometime in 2008 or 2009, the TLC learned from passenger complaints that a cabdriver named Wasim Khalid Cheema had allegedly overcharged passengers.

36.     Sometime in early 2010, the TLC has stated that it learned that certain taxi driver had been overcharging passengers by engaging the Rate 4 button on their taximeters.

37.     In the course of investigating the allegations against Cheema, the TLC reviewed its computer tracking records of Cheema's trips up until the time of the passenger complaints as well as in the months after the passengers complained (but

before the TLC charged Cheema with violation of its overcharge rules.)

38.     On information and belief, the TLC learned that Cheema had persistently engaged Rate 4 (that is on nearly every trip) within the five boroughs of New York for a period of months.

## The Expanded, and Warrantless, Investigation

39.     Following the Cheema investigation, the TLC expanded its review of computer records to include substantially all of the city's roughly 42,000 yellow taxi drivers.

40.     On information and belief, the TLC never attempted to obtain a warrant from any judge or judicial officer to allow its tracking or its search of computer records.

41.     There were no exigent circumstances that would have made it impossible or even inconvenient for the TLC to secure a search warrant.

42.     At that time, neither the TLC nor any of the defendants had any cause or reason to suspect that plaintiff had engaged in overcharging passengers.

43.     The TLC had never received a single complaint from any passenger alleging that plaintiff had overcharged any passenger.

44.     Plaintiff was included in the investigation of taxi drivers generally.

45.     The TLC reviewed plaintiff's individual trips and movements using its GPS records and technology.

46.     The TLC never asked plaintiff's consent to do track their individual movements.

47.     Likewise, the TLC never asked the consent of any taxi driver for consent to review his individual records and movements.

48.     The TLC was at this time engaged in a search for evidence to be used in potential criminal or administrative prosecutions.

49.     Over time, the TLC shared its records with various prosecuting agencies

including the Department of Investigation and the New York County District Attorney.

### The TLC 'Discovers' an '$8.3 Million' Scam

50.     At 4:04 PM on March 12, 2010, the TLC issued press release via e-mail under the subject heading "Taxi Scammers."  After apologizing for the late-afternoon information "drop," the release announced that it had "discovered" that "35,558 [taxi] drivers" had "illegally overcharged at least one passenger" over a 26-month period by manually switching the taxi meter from Rate Code 1 (default setting used for trips inside NYC) to Rate Code 4, the rate that applies to out-of-city trips.  The release specified that the overcharges had occurred on precisely "1,872,078 trips" and that the "total" overcharge was "$8,330,155, or an average of $4.45 per trip." March 12, 2010 Press Release.

51.     While no reason was given for announcing the news late on a Friday afternoon, the release came just days before former TLC chairman Matthew Daus, who had been in office for 14 years, left the agency.  (Daus was replaced as chairman by David Yassky on March 24, 2010.)

52.     The TLC later averred that its investigation was set off by its finding that a single taxi driver had employed Rate 4 to overcharge a passenger.

53.     The TLC has never claimed or even suggested that there was probable cause or even reasonable suspicion to scour the GPS records of thousand of taxi drivers or the plaintiffs here.  *See* "Previous Taxi Fraud Cases, but No Red Flags," NY Times, March 17, 2010.

54.     Even after its announcement, the TLC never sought a warrant to allow GPS tracking of plaintiff and had no reason to suspect that Mr. El-Nahal.

55.     Indeed, in sworn testimony Pansy Mullings, the former TLC director of enforcement, admitted that there were few complaints by actual passengers—this despite the hundreds of thousands, if not millions, of supposed overcharges.  And it is also

despite the fact that, overall, the TLC receives roughly *twenty thousand* civilian complaints (of all kinds) annually.

56.     Even after the TLC publicized the alleged Rate 4 problem and it was widely reported in print, radio and television, less than a handful of alleged victims came forward.

57.     The TLC has never claimed any exigent circumstances that would have made it impossible or even inconvenient to secure a search warrant.

58.     In its initial announcement, and many times since then, the TLC admitted it made its discovery of the alleged scam by "using GPS technology installed in taxicabs." Even as it was offering these extravagant—and ultimately unsupportable — accusations of widespread abuse, the TLC was constrained to note that while the overcharges were on "over 1.8 million trips … there were 361 million taxi trips during" the 26-month period in question so "the illegal fare was only charged in 0.5% of all trips."

59.     The TLC press release added: "The information has been referred to the Department of Investigation, " and added that it would be "moving forward on administrative enforcement, which includes seeking revocation for the most serious offenders.

60.     The release quotes Mayor Bloomberg as saying, "[S]ome of these people could face serious charges," that is criminal charges. At around the same time, Mayor Bloomberg said on his radio show, "Now, how we would ever recoup the money and get it back to the individual payers, no, but we can stop the practice and we can make sure there's penalties."

61.     The media picked up the story eagerly and without question. The New York Post headline shouted: "Taxi drivers scammed passengers to the tune of $8M by rigging meters." The Daily News ran its story under the headline, "36,000 city cabbies

-10-

overcharged passengers by $8.3M in widespread meter scam." The New York Times announced: "New York Cabs Gouged Riders Out of Millions."

62.     Daus, the soon-to-be-departing Commissioner, told the Times: "We have not seen anything quite this pervasive. It's very disturbing." To the Post, Daus opined, "I think these people are criminals."

### The TLC Backtracks from Its Story

63.     Just 10 days later, however, the TLC admitted that the account it had aggressively marketed was wildly inaccurate.

64.     Chairman Daus admitted, "[A] fairly significant number" of the incidents resulted in no additional charges, suggesting they might have been simple mistakes. NY Times, March 22, 2010; Village Voice, March 23, 2010.

65.     The agency's press release of May 14, 2010 offered a revised version of the story. It now stated: "21,819 taxicab drivers overcharged passengers a total of 286,000 times … for a total estimated overcharge of almost $1.1 million"—not "$8,330,155."

66.     Even assuming the 286,000 figure is correct, it means that Rate 4 was used to overcharge passengers on less than one trip out of one thousand.

67.     The TLC did not explain how its initial numbers, stated with such precision, had been so far wrong, or why its new version was more credible.

68.     Rather than accept responsibility for the errors, Daus claimed "The numbers that the press reported"—which were precisely the numbers the TLC announced— were misleading. As to its methods, the TLC allowed: "Each taxicab is equipped with a taxi technology system device that records certain data about each trip … including … the dates, times, and locations of each pick-up and drop-off." But the TLC never claimed in this press statement (or before or since) that it had probable cause for warrant permitting it to track the locations of taxi drivers for months and years and to use

the fruits of its tracking to prosecute those drivers.

69.     While the TLC had now conceded its initial numbers were wrong by a factor of six in terms of trips and incorrect by a factor of eight in terms of dollar value, the media still presented the "scam" as pervasive.  Despite its initial numbers being wildly off the mark, expressed utter confidence that it was (now) correct.

70.     Nevertheless, to date, with the exception of one or two drivers, the TLC has not claimed that any actual passenger has claimed that he or she was overcharged.

71.     Its allegations are based on its use of GPS technology (as well as the technology that transfers the GPS data to vendors' computers and then to the TLC) only.

72.     In sworn testimony at an administrative hearing, Ms. Mullings admitted that the TLC's prosecution of individual drivers would have been a practical impossibility without GPS tracking.

73.     Once a driver engages Rate 4 (whether by accident or on purpose) there is no way for him to reverse it or return the meter to the normal rate.

**The TLC's Prosecution Offensive**

74.     The May 14 press release, apparently certain that its restated numbers were correct, outlined the TLC's prosecution strategy.  The agency announced it was "in the process of initiating license revocation proceedings against taxicab drivers who were identified with 50 or more overcharges.  Drivers with evidence of between 10 and 49 overcharges would have the option to surrender their TLC license or face fines ranging from $1,000 to $5,000.  Drivers with less than 10 overcharges would be reviewed on a case by case basis."

75.     Based on its revised numbers asserted, the TLC said it still intended to revoke the licenses of at least 633 drivers, and possibly more than 2300, some of whom had gained, by the TLC's accounting, less than $50 from the alleged scam.

76. Later, the terms of the settlement offers changed. The stipulated penalty would vary depending on the number of alleged overcharges. Any driver with more than 120 violations would have to surrender his taxi driver's license (and pay a fine). Drivers with fewer violations would have to pay a fine of $100 per violation, but could remain licensed.

## The Allegations against Mr. El-Nahal

77. On or around January 3, 2012, a TLC prosecutor sent Mr. El-Nahal a letter "in reference to allegations" that he had "deliberately and intentionally" overcharged passengers on ten separate occasions between November 20, 2009 and February 2, 2010.

78. As a full-time taxi driver, Mr. El-Nahal would complete more than 9,000 trips per year.

79. The letter demanded that Mr. El-Nahal appear at a conference at which he would be offered a settlement by which he would pay $1000.00 (based on $100 per occurrence). Otherwise he would be tried at a revocation hearing at OATH "in which TLC will seek to revoke your license and impose a substantial fine."

80. Under the NYC Administrative Code, the penalty for three overcharges of a passenger within 18 months is license revocation.

81. The letter added: "OATH has already decided many similar rate 4 overcharge cases which have resulted in license revocation and substantial fines." The letter cited TLC v. Ajoku, Index No. 408/11, and TLC v Gueye, Index No. 354/11.

82. Other letters to drivers cited the Cheema case, and claimed similar evidence. These letters omitted the fact that in the Cheema case, the TLC found in its investigation that the driver had engaged Rate 4 on nearly every trip, that his income far exceeded that of other drivers, and that passengers had filed complaints against him.

83. In fact, with few exceptions, the TLC had no evidence of a deliberate overcharge.

84.     In fact, at that time, there had been less than a handful of contested Rate 4 overcharge cases decided by OATH.  While, the Ajoku case was contested by a driver appearing *pro se*, the Gueye case, and nearly all others "decided" at OATH were following default hearings, that is where the charges were uncontested and the driver was not represented by counsel.

85.     Mr. El-Nahal, appeared for the settlement conference also without counsel.

86.     At the conference, the TLC prosecutor advised him that there had been a "careful investigation" so that they knew that he was guilty of the charges.  If he insisted on a hearing, the prosecutor advised he would certainly be found guilty and that his license would be revoked.  The prosecutor acknowledged that Mr. El-Nahal had a good record, and he offered to allow him to settle the case by paying $900.

**The Initial Hearing**

87.     Mr. El-Nahal appeared for a hearing, again without counsel, on May 7, 2012.  The hearing, however, was not at OATH, but at the TLC's own tribunal.

88.     Mr. El-Nahal was found guilty and the ALJ imposed fines totaling $550 and revoked his license.

89.     On appeal by counsel (hired at Mr. El-Nahal's expense), the TLC Tribunal appeals board reversed.  The tribunal held:

> "The elements of an overcharge include among other things, what the overcharged fare was, what the correct fare was, the nature of the trip involved, and whether or not there was an intent on the part of the person charged with an overcharge to do so.  Here, the ALJ failed to set forth which trips resulted in an overcharge and on what basis he decided that the respondent intentionally caused the overcharges.  Moreover, the ALJ did not state which party he found credible.  Under these circumstances, the ALJ's decision is reversed as it is not supported by substantial evidence."

90.     Following this appeal decision, Mr. El-Nahal's license was reinstated.

91.     The TLC later re-filed one of the six charges against him, never explaining

why it did not charge all six as it had before.  A hearing was held on July 13, 2012, at

which the TLC offered the same single piece evidence that the appeal tribunal had

already found insufficient.

92.     ALJ Lee found Mr. El-Nahal not guilty and concluded that the TLC's

evidence was not even enough to make a prima facie case:

> "I find that the Commission has not proven the respondents' intent
> to overcharge in this case. I find that the Commission's single
> piece of evidence, the trip record, is insufficient to prove that the
> respondent intentionally charged the passenger a Rate 4 code.
> Based on Mr. Royter's affirmation, I find that the Commission has
> not discounted or eliminated the possibility of human error or
> mechanical error as the Source of a Rate 4 charge.  Also with an
> intentional act there is the issue of consent.  The Commission did
> not present evidence from the passenger to discount the possibility
> of consent by the passenger to a charge of Rate 4 for a Rate 1 trip.
> Accordingly I find that a prima facie case has not been established
> and the summons is dismissed."

93.     Though the TLC adjudication rules allow the TLC to appeal an adverse

ruling (which it often does) to the TLC Tribunal appeals board, the TLC did not appeal.

Thus, ALJ Lee's ruling became a final judgment binding on the agency.

94.     Despite this TLC appeal board's ruling and ALJ Lee's ruling, the TLC

again filed five charges that it had filed originally, but had not re-filed.  These five

alleged overcharges total eight dollars and forty cents.

95.     A hearing was scheduled for August 14.  Mr. El-Nahal appeared with

counsel on that date. But the TLC announced it was not prepared to proceed, telling the

ALJ it needed "to conduct further investigation in light of the appeal."  ALJ Bello granted

an adjournment over Mr. El Nahal's objection and despite the absence of the required

"good cause" until September 13.

96.     At the hearing on September 13, the Commission had no new evidence.

There was nothing from its claimed "further investigation."  It offered exactly the same

evidence, that is trip records and the same affidavit by Serge Royter (which does not

mention Mr. El-Nahal or make any claim regarding intent).  There was no evidence of

intent that this Tribunal had held was required.

97.    Nevertheless ALJ Gould found Mr. El. Nahal guilty on all five counts and revoked his license.

98.    Mr. El-Nahal appealed again and the appeals board reversed again.  In a decision dated October 19, 2012, the appeals board wrote:

> "Here, the ALJ found that intent was inferred from the circumstance of the respondent's 'trip sheets taken together of various days.' However, the ALJ's decision fails to explain how a group of trip sheets of various unspecified days established intent on the part of the respondent to overcharge passengers without even pointing to any particular trip numbers. In addition, the ALJ credited the Commission's method of overcharge calculation but failed to explain the Commission's method of overcharge calculation. The ALJ failed to explain how five alleged instances of overcharges totaling $8.40 stated on five separate trip sheets spanning 4 months for a driver who has been licensed since 1998 and who testified he averaged approximately 40 trips per day proved intent, how the alleged overcharges of $1.20, $2.00, $1.60, $2.40 and $1.20 were respectively determined, and what the correct fares should have been for each of these five trips. The ALJ also failed to make a finding regarding the type of taximeter used by the respondent in each instance of alleged overcharge, the location of the rate buttons on the particular meter, the sequence required to activate rate 4 on the particular meter, how it was/was not possible for the respondent to mistakenly hit the wrong button while operating his taxicab, whether the Rate 4 button was pressed at the beginning, end or during a trip, and whether pressing the Rate 4 button at the beginning, end or middle of a trip using the particular meter impacted on the respondent's intent to allegedly overcharge his passengers."

99.    Following this second reversal, the TLC re-filed the same charges.  At a hearing on February 19, 2013, the agency prosecutor offered the same evidence—trip sheets, Google maps and the Royter affidavit. The prosecutor made no effort to come tot terms with the appeals board decisions, saying only that he was permitted to re-file the charges.  He offered no proof of intent beyond the trip records.

100.    The TLC ALJ found Mr. El-Nahal guilty nevertheless and ordered his license revoked.

101.    Mr. El-Nahal appealed for a third time, and the conviction was again reversed, this time with prejudice, for failure to make a prima facie case.

102.    In a ruling dated March 6, 2013, the appeals board wrote:

> [T]he Royter affirmation and the Google maps and do not supply
> evidence of the respondent's intent to overcharge. In his
> affirmation, Serge Royter (Commission's Enforcement Division,
> administrative summonses) says that he worked exclusively on the
> Commission's Taxicab Passenger Enhancement Project ("TPEP")
> system for about two-and-one-half years . He generally described
> the TPEP system, fare rates, the different brands of taximeters and
> how the different rates are engaged on each brand, how he
> determined whether a passenger was overcharged, and that he
> determined that this  respondent "in this case overcharged the
> passenger by engaging Rate Code 4 within the five boroughs of
> New York City."    This information establishes nothing beyond
> what the trip sheets establish, which was found insufficient,
> namely, that Rate 4 was engaged and Rate 4 should not have been
> engaged for trips within New York City.
>
> The Royter affirmation  does not state that this respondent engaged
> Rate 4 intending to overcharge -- as the ALJ found the affirmation
> to state -- but merely that 'I am certain that Rate Code 4 was
> engaged at some point during a trip when a VTS [taxi]meter was
> engaged, just not the exact time.' [citing the Royter Affirmation]
> And, at the Royter Affirmation, p. 3, Royter states only, 'It is from
> this [Commission  database of VTS uploaded data] that I
> determined that [this respondent] overcharged the passenger by
> engaging Rate Code 4 within the five boroughs of New York City.'
> Again, Royter does not state that this respondent intended to
> overcharge, only that he did overcharge.  Thus, the Royter
> affirmation does not prove that this respondent intended to
> overcharge….
>
> Thus, the Commission did not prove intent….
>
> Thus, the Commission did not establish any of the crucial elements
> of an overcharge -- the correct charge and intent -- and the
> summonses  should have been dismissed for the Commission's
> failure to make out a prima facie case

103.    Mr. El-Nahal's license was restored, but not before he lost considerable

wages and suffered substantial emotional and physical pain.

104.    The TLC did not appeal the March 6, 2013 decision.

105.    In each of his appeals, Mr. El-Nahal argued, among other things, that the

TLC's use of GPS tracking violated the state and federal constitutions and that the TLC's

technology had not been determined to be sufficiently reliable that inferences from its

results should not be admissible.  The appeals board noted the arguments, but did not rule

as it granted relief on other grounds.

## Class Action Allegations

106.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all taxi drivers who have been charged by the TLC with wrongdoing on the basis of GPS search evidence.

107.    The class is so numerous that joinder of all members is impractical.  The TLC has maintained that as many as 21,819 taxi drivers have committed Rate 4 overcharge violations and it has sent letters of allegation demanding settlement to at least 2000 drivers.

108.    There are questions of law and fact common to the class that predominate over questions affecting only individual members, including but not limited to whether the TLC's use of evidence gathered by GPS search is lawful and constitutional.

109.    The claims of the class representative are typical of the claims of the class members and, by pursuing his own interests, the class representative will advance the interests of the absent class members.  Each class member has been charged with and/or convicted of Rate 4 overcharges.

110.    The class representative will fairly and adequately protect the interests of the class.  There are no conflicts of interest between the class representatives and the absent class members, and the class representative will vigorously prosecute this action on behalf of the class.

111.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

112.    Defendants have consistently acted and refused to act in ways generally applicable to the class.  Thus, declaratory and equitable relief with respect to the class as a whole is appropriate.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION / 42 U.S.C. § 1983

113.    The installation and use of a GPS device to track a persons' location in an automobile constitutes a search under the Fourth Amendment.

114.    Defendants never had probable cause and never obtained a search warrant to track the defendants by GPS.  Defendants' use of GPS devices to track plaintiff's whereabouts violates the Fourth and Fourteenth amendments to the Constitution.

115.    By implementing, promulgating, enforcing and/or effectuating a policy, practice and custom pursuant to which taxi drivers may be tracked with GPS devices and technology, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

116.    All defendants have acted under pretense and color of state law, in their individual and official capacities, and within the scope of their employment.  Said acts by said defendants were without authority of law, and in abuse of their powers and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth and Fourteenth amendments to the United States Constitution.

117.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

### SECOND CAUSE OF ACTION / N.Y. CONSTITUTION

118.    The use of a GPS device to track a persons' location in an automobile constitutes a search.  Defendants never had probable cause and never obtained a search warrant to track the defendants by GPS.  Defendants' use of GPS devices to track

plaintiffs' locations violates the Article I, § 12 of the State Constitution.  Thus the order based on such evidence was in violation of lawful procedure, was not supported by substantial evidence, and was arbitrary, capricious and in violation of law.

119.    All defendants have acted under pretense and color of state law, in their individual and official capacities, and within the scope of their employment.  Said acts by said defendants were without authority of law, and in abuse of their powers and with the specific intent to deprive plaintiffs of their constitutional rights secured by New York Constitution.

120.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

## THIRD CAUSE OF ACTION / TAXI TECHNOLOGY EVIDENCE

121.    The TLC'S so-called T-PEP system has never been tested or shown to be scientifically reliable.  Accordingly, testimony and evidence based on deductions from the T-PEP system should not have been admitted or considered at any hearing.  Thus any order based on such evidence was in violation of lawful procedure, was not supported by substantial evidence, and was arbitrary, capricious and in violation of law.

## FOURTH CAUSE OF ACTION / ARTICLE 78

122.    These orders were made without support by substantial evidence, in violation of law and in violation of Article 78 of the N.Y. Civil Practice Law and Rules.

123.    Revocation orders by TLC ALJs, by OATH ALJs, or by the TLC chairman were not based on evidence sufficient to make a prima facie case of an overcharge in violation of TLC rules of the NYC Code.

124.    These orders were made without support by substantial evidence, in violation of law and in violation of Article 78 of the N.Y. Civil Practice Law and Rules.

## FIFTH CAUSE OF ACTION / NYC CHARTER

125.    Pursuant to the City Charter, the TLC may only enact rules by a majority

of its members and after compliance with the City Administrative Procedure Act's Notice and Comment requirement.   In contravention to the Charter, the TLC, without a vote and without notice or comment, required taxi drivers to report additional information (via the taxi technology vendors) that exceeds the reporting requirements of TLC Rule 3-06.

## SIXTH CAUSE OF ACTION / FRAUDULENT INDUCEMENT

126.    The TLC fraudulently induced taxi drivers or attempted to induce taxi drivers to sign stipulations of settlement by misrepresenting the adequacy and quality of the evidence they had concerning each driver and by claiming that the agency had proven similar claims in OATH hearings.  In fact, the TLC had little or no record of success in the OATH tribunal in contested cases and lacked evidence to make a prima facie case of the alleged violations.  Based on such false representations, taxi drivers agreed to settle claims by paying fines or surrendering their licenses.

## RELIEF REQUESTED

WHEREFORE, plaintiffs ask this Court:

a.    To issue an order declaring that the use of GPS technology to track plaintiffs is a search under the Fourth Amendment as well as under New York law;

b.    To issue an order declaring that the use of GPS technology to track plaintiffs is a search under the New York Constitution;

c.    To issue an order declaring this search, when conducted without a warrant, violates the Federal Constitution and the New York Constitution;

d.    To issue an order that the TLC restore the taxi driver's license of drivers who were prosecuted based on GPS tracking evidence;

e.    To issue an order certifying this action as a class action;

f.    To require defendants to pay incidental and consequential damages;

g.    To require defendants to pay punitive damages;

h.    To require defendants to pay attorneys' fees pursuant to 42 U.S.C. § 1988;

i.    To require defendants to pay attorneys fees and costs; and

j.      To grant such other and further relief as this Court shall find just and proper.

Dated: New York, New York
May __, 2013


__/s/_____
Daniel L. Ackman (DA-0103)
12 Desbrosses Street
New York, NY  10013
(917) 282-8178

Attorney for Plaintiff